Henry W. Lengyel, J.
This is a motion for summary judgment in a claim by Robert J. Kaiser and Mary Elizabeth Kaiser, the claimants herein, against the State of New York, for damages flowing from the personal injuries sustained by Mary Elizabeth Kaiser in an accident at Mt. Von Hoevenberg Bobsled Run on February 14, 1965.
The defendant, State of New York, cross-moved for an order dismissing the claim upon the grounds that the court lacked jurisdiction by reason of untimely service upon the Attorney-General ; that the claim had been released; and, that claimants assumed the risk. The State also opposed the claimants’ motion on the grounds that summary judgment is not available in the *577 Court of Claims; and, in any event that significant issues of fact exist which can only be determined after trial.
The jurisdictional question of untimely service was resolved upon the oral argument of the motion. Judge Sidney Squire, of this court, granted these claimants the right to file this claim on or before December 10, 1965, by order dated November 23, 1965. Said order was not appealed by the defendant and the claim was thereafter duly filed.
We thought the question of the power of the Court of Claims to render summary judgment had been fully and most cogently determined in the affirmative in Vern Norton, Inc. v. State of New York (27 AD 2d 13) and, reaffirmed in Chemical Bank N. Y. Trust Co. v. State of New York (27 A D 2d 427, 428). Cf. Higgins & Sons v. State of New York (20 N Y 2d 425, 429) wherein the Court of Appeals stated in dicta: ‘1 Under CPLR 3212 (subd. [e]), the court [Court of Claims] could have granted partial summary judgment in plaintiff’s favor in the amount of the undisputed portion of his claim.” Certainly, zeal in the performance of one’s responsibilities is to be greatly admired. However, we also recommend to the Department of Law of the State the doctrine of stare decisis et non quieta movere.
There is, of course, no question that a party may demand the remedy of summary judgment in a cause which sounds in tort. (CPLR 3212, subd. [b]; Appel v. Root, 18 A D 2d 686, affd. without opn. 13 N Y 2d 748; Cooper v. Greyhound Bus Corp., 13 A D 2d 173, 174; 4 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 3212.03.) However, such relief must be granted with caution and only where it becomes crystal clear that no genuine fact of substance remains at issue between the parties. (Sillman v. Twentieth Century-Fox Film Corp., 3 N Y 2d 395, 404, mot. for rearg. den. 3 N Y 2d 941; Hood v. Murray, 25 A D 2d 163, 164, app. dsmd. for nonfinality of order 17 N Y 2d 911; Connell v. Buitekant, 17 A D 2d 944; Schneider v. Miecznikowski, 16 A D 2d 177, 178; Gerard v. Inglese, 11AD 2d 381, 383; Esteve v. Abad, 271 App. Div. 725.)
We had before us during our consideration of the motion and cross motion herein, affidavits of the two claimants; an examination before trial of five State employees, who were produced for examination by the State pursuant to the direction of a Judge of this court to produce employees with knowledge; affidavits of claimants’ witnesses; and, certain other documentary evidence. It should be noted that, although the State conducted examinations before trial of the claimants and their witnesses, Mr. and Mrs. Dunne, it did not present such exami *578 nations to the court as part of its opposing moving papers. The State’s attorney did make five page references in his affidavit to the examinations before trial but did not see fit to submit these examinations to the court for its own perusal and evaluation. The opposing papers included an affidavit from the Assistant Attorney-General which, although it did not so state, had to be made on information and belief insofar as the facts were concerned; and, must therefore in that respect be considered 1 ‘ pure hearsay, valueless and must be disregarded (Di Sabato v. Soffes, 9 A D 2d 297; Cohen v. Pannia, 7 A D 2d 886).” (Hood v. Murray, supra, p. 163.) The opposing papers also included an affidavit by one, Royal Tallman, the General Park Foreman in charge of the Mt. Von Hoevenberg Bobsled Run. By this affidavit the State apparently seeks to refute the occurrence of the accident by stating that no accident was reported on February 14; and, to raise an issue as to exact angle of recline assumed by Mrs. Kaiser on the sled after the accident. The inital point is illusory and not a fact of substance. There is no question, in my opinion, that Mrs. Kaiser was injured on the bobsled run on February 14, 1965, at between 2:25 to 2:30 p.m. ; and, the fact that the claimants did not report the accident or injury on February 14 does not refute the fact of the accident or injury. Further, the question of semantics raised by the State as to whether, as Mr. Tallman and the Assistant Attorney-General put it, Mrs. Kaiser was lying horizontal on the sled after the accident, or, as claimants put it in their several affidavits, ‘ ‘ prone on the sled,” ‘1 laid out in the lap of the brakeman,” “collapsed back into the lap of the brakeman, ” “ lying on the sled, ’ ’ 1 ‘ lying in the lap of the brakeman ’ ’, and the alleged fact that until the driver and two forward passengers got off the sled a person*could not “lie horizontal” on the sled, do not raise an issue of substance. The State has made absolutely no attempt to “ lay bare ” the proof the defendant had (Dodwell & Co. v. Silverman, 234 App. Div. 362), perhaps because it had none, or to present “ a genuine and substantial issue of fact ”. (Estere v. Abad, supra, p. 727.) (See, also, Varone v. Calarco, 22 Misc 2d 1085.) Mr. Tallman’s affidavit also relaated to the signed waivers and maintenance of the bobsled run which will be discussed at a later point in this decision.
After an examination of the various papers set forth above we find the following facts.
The State Conservation Department of the State of New York operates a bobsled run in the Town of North Elba, known as Mt. Von Hoevenberg Bobsled Run, The claimants *579 and their friends, Michael and Eenee Dnnne, visited said bobsled run on February 14, 1965 at about 2.00 p.m. and each paid an admission fee of $.75. After observing some of the sleds finishing the run, the claimants and Mr. Dunne boarded a truck which carried them to the half-mile point of the run. An admission fee of $1.00 per person was paid so that they might ride as passengers on a bobsled down the run from the half-mile point. At the request of the attendant at the half-mile point, all three signed a printed waiver form, State’s Exhibits “A” and “ B ”. None of them read the form and it was not read to them by the attendant or any other employee of the State. Helmets, similar in type to football helmets, were supplied to all three by the attendant.
Mr. Dunne preceded the claimants down the run. His affidavit disclosed that toward the end of the ride and approximately the middle of the finish curve, he experienced “ a very hard, vertical impact or jolt.” Shortly thereafter, the sled came to a stop and, upon alighting therefrom, he noticed that his brakeman was “ lying back and moaning.” Shortly thereafter, claimants’ sled arrived at the same area where the injured brakeman was still sitting on the sled, and Mr. Dunne noticed that Mrs. Kaiser was lying in the lap of her brakeman and that she stated she could not sit up or move her legs.
Inquiry was made by both Mr. Dunne and Mr. Kaiser as to the availability of a doctor and they were told that a doctor was not available. Both Mr. Dunne and Mr. Kaiser aided the claimant, Mrs. Kaiser, to a standing position and assisted her to an automobile and thence to the Placid Memorial Hospital emergency room. On the way to the automobile, they passed along the bobsled run just opposite the finish curve and, at this point, Mr. Dunne observed a cut or gash in the wall of the finish curve which he estimated to have been “ 3 to 5 feet long.”
Claimants ’ Exhibit “ B ” is a reproduction of the emergency room record of the Placid Memorial Hospital, Lake Placid, New York, which disclosed the time of arrival of the claimant, Mary Elizabeth Kaiser, as 3:00 p.m., February 14, 1965, with a history therein stated as follows: “ Hurt back on bobsled at bobrun.”
Both claimants submitted affidavits which corroborated the facts as stated by Mr. Dunne but, additionally, disclosed that they followed Mr. Dunne down the run one or two sleds after him. Mr. Kaiser sat immediately in front of his wife, who in turn was in front of the brakeman. Neither was able to estimate the speed of the sled but both felt a severe vertical jolt *580 in the middle of the last or finish curve. Mrs. Kaiser stated: “At approximately the middle of the last or finish curve of the bobsled run, I felt a severe vertical jolt. I immediately felt a sharp piercing pain in my entire back as well as a shortness of breath. ’ ’
Both of the claimants stated that they observed a large gash or cut in the wall of the last curve. Mr. Kaiser described it as “ about 3 to 4 feet long, approximately 1 to 1% feet wide and approximately 6 inches deep,” and Mrs. Kaiser described it as “ approximately 5 to 6 feet long, 2 feet wide, and approximately 3 to 5 inches deep.” Mrs. Dunne described the cut as ‘ ‘ about three or four feet long, approximately one to one and half feet wide and approximately six inches deep.” Shortly after the Kaisers made their run, 2:32 p.m., it was announced over a public address system that the bobsled run had been closed.
The injured brakeman on the Dunne sled, Wendell B. Wells, was examined before trial. He testified as to the manner in which the run was maintained and described the phone connections and control booths along the run from the top to the bottom. On the day in question he was braking for one William Darrah and described the run at the time he was injured to the effect that ‘ ‘ when we got on the finish curve, the runners — one of the rear runners — went into a cut and it produced quite a jolt because I was sitting right over the axle, or the bar that the runners are connected to.” He stated that this was such a severe jolt he thought he had broken his back. He estimated said cut or gash in the finish curve of the run to be approximately 2 feet long, 6 inches wide and 4 to 5 inches in depth. He also stated he had observed the cut before the run in which he was injured; and, in fact, had previously discussed the existence of the cut with his driver, Mr. Darrah. At the examination before trial in 1966, Mr. Wells estimated that he sustained his injury at “ around 2:00 o’clock ”. In the investigation report prepared and signed by Mr. Tallman, Exhibit “ D ”, the time of the Wells accident was pinpointed at 2:20 p.m.
Mr. Darrah, driver of the Dunne sled, had made several runs during the day and had observed the cut in the finish curve. He stated, when first observed, the cut was not enough to bother the drivers; and, that in at least 10 or 12 trips before Mr. Wells was injured, he had managed to avoid the cut in the finish curve. He also testified that in the operation of the sled there is a certain place in the run that yon prepare to ride the finish curve and ‘1 if that cut is in your drive line, you got to take it. ’ ’ He went on to state that observation booths are strategically *581 placed for the safety of the passengers to make certain that the run was clear and safe; but, that in respect to the condition of the run, the drivers pull their sleds off if they determine that they cannot drive the run, and that if the run becomes in “ bad shape ” they tell the Superintendent.
Mr. Albert Claremont, Jr., a driver on the Mt. Von Hoevenberg Bobsled Bun on February 14, 1965, was examined before trial. He testified that he did not recall the day other than by refreshing his recollection that Wendell Wells sustained an injury. With his recollection refreshed, he did recall that there was a cut in the finish curve that day, but he could not describe it. He did not recall any of his passengers being injured.
Mr. Boyal Tallman was examined- before trial and stated that he had charge of the bobsled run at Mt. Von Hoevenberg under the title of General Park Foreman. His duties consisted of construction, maintenance and operation. It was pointed out through his testimony that all paying passengers are required to sign a waiver. Mr. Tallman inspected the finish curve immediately after Mr. Wells was injured. He recalled a cut or gash in the wall of the finish curve; and, although he could not remember the size of the cut, he stated it was possible it could have been as long as 5 feet and that it might have been 8 to 10 inches wide and about 2 or 3 inches deep. He was not certain whether he had examined the cut before another sled came down the run but admitted there was time for him to inspect the wall of the finish curve before another sled came down. There is absolutely no question there was sufficient time to close the run after the Wells accident and before any other sleds came down the run. However, Mr. Tall-man did not believe he notified the control booths of the Wells accident; and, he further stated that, after he examined the cut, he did not think it was serious enough to suspend operations. In claimants’ Exhibit “ G ”, which is a reproduction of a letter dated June 14, 1965 and written by Mr. Tallman to Mr. W. B. Petty, District Director in the New York State Conservation Department, he stated that “ The run, and the finish curve in particular, was rough on this day and got to the point which I considered unsafe and closed at 2:32 p.m. It is quite possible that Mary Kaiser suffered a wrenched back or other injury that was not reported.” Thus, although the State seeks to raise the issue whether an accident actually occurred, there is an admission that an injury might well have been sustained by Mrs. Kaiser. Thus, although a few minutes after 2:20 p.m., the Superintendent did not think the cut or *582 gash was an unsafe condition, at 2:32 p.m., after Mrs. Kaiser was injured, he closed the run because it “ became unsafe.”
The State contends there is an issue of contributory negligence which has not been met by the claimants herein. We disagree. The operation of the bobsled was in the complete control of the driver and the bralternan, both State employees, and, inferentially, competent employees. Mrs. Kaiser occupied the passive status of a passenger who had to sit on the sled and hold onto straps which were affixed to the sled. She sat on the sled and held onto the straps until the severe jolt, which caused such pain that she could no longer hold said straps. The maintenance of the bobsled run was also in the complete control of the State; and, although the State had knowledge of the gash in the ice wall before Mrs. Kaiser’s sled made the run, neither she nor her husband was advised of the fact of the gash and the potential danger. Certainly, we cannot find that these claimants acted imprudently in riding the bobsled. Under all the facts presented, they have met their burden of. proving freedom from contributory negligence.
The facts, as outlined above, clearly prove that there was a gash or cut in the ice wall of the finish curve of the State-maintained bobsled run; that said gash or cut made the bobsled run unsafe to operate (cf. Ross v. State of New York, 283 App. Div. 834); that the .State had actual notice of this unsafe condition in sufficient time to suspend operations before the sled upon which the claimants were fare-paying passengers made its run; that the State did not suspend operations until after Mrs. Kaiser was injured; that Mrs. Kaiser was injured by a severe jolt which occurred at a point in the middle of said finish curve where said gash or cut was located; and, that the claimant passengers were not contributorily negligent. • We believe the fact situation developed by the claimants, which was not rebutted by the State, was consonant with our conclusion, that the State’s negligence was a proximate cause-of the accident and injury herein. As stated in Gerard v. Inglese (11 A D 2d 381, 383, supra): “Whether negligence is established prima facie by direct or circumstantial evidence, the question as to whether the defendant was at fault in what he did or failed to do is ordinarily one of fact, to be determined by the jury, unless the jury is waived (George Foltis, Inc. v. City of New York, 287 N. Y. 108, 122; Salomone v. Yellow Taxi Corp., 242 N. Y. 251, 259). * * *
“ Upon a prima faere case the jury is not compelled to award damages; and a failure to explain does not necessarily indicate' negligence (Salomone v. Yellow Taxi Corp., supra, p. 259). *583 The situation is different, however, where the undisputed facts are consistent with only one conclusion; or, as the Court of Appeals in the Foltis case (supra) said with respect to circumstantial evidence, where the prima facie proof is so convincing that the inference of negligence arising therefrom is inescapable, if not rebutted by other evidence (cf. also, Nixon v. New York Cent. R. R. Co., 10 A D 2d 870).”
As we have determined that a proximate cause of this accident was the negligent maintenance and operation of the bobsled run, it is not necessary for us to determine whether or not the State was also negligent in the actual operation of the bobsled.
The State raised the question of assumption of the risk as a fact requiring trial of the claims herein. However, upon examination of the facts and the law this question falls by the wayside.
Certainly, these claimants assumed the risks inherent to the sport of bobsledding. However, they did not assume the risk incident to an unsafe condition of the bobsled run, a condition of which they had no knowledge. As stated in Barrett v. Lake Ontario Beach Improvement Co. (174 N. Y. 310, 316): “All persons were invited, upon the payment of an entrance fee, to make use of this structure and the amusement provided for involved some risks. These risks attending an amusement which was prepared to allure the public for their emolument, the proprietors, or lessors, were bound to anticipate and to protect against, so far as they were not necessarily incidental thereto. * * * They came there by invitation and with the right to believe that every reasonable care had been taken for their safety ”. (See, also, Lumsden v. Thompson Scenic Ry. Co., 130 App. Div. 209; Schmidt v. State of New York, 198 Misc. 802; Bard v. Board of Educ., 140 N. Y. S. 2d 850; Restatement, Torts 2d, §§ 496 D, 496 E.)
There remains the question of a possible release of the claim by reason of the waivers which were signed by the claimants prior to their making the run. These waivers were required by section 3 of chapter 273 of the Laws of 1932 which states: “No person shall be permitted to use the said bob-sled run unless and until such person shall have executed and delivered to the conservation commissioner or his duly authorized agent an instrument in writing wherein he shall state that he knows the risks inherent in such use and fully and freely assumes any injury or damage which may result to him from such use, and whereby he waives any claim for damages by reason of injuries sustained by him in such use, and whereby he releases *584 and discharges the state of New York and the conservation commissioner from any claim for damages which he might have by reason of injuries sustained in the use of the said bob-sled run, except such as might arise from the negligence of the state of New York, its agents, servants or employees.” (Emphasis added.)
The waivers which were signed were broad in their scope and reflected the requirements set forth in said statute. However, consistent with the statutory language the waivers omitted any release for damage caused by the negligence of the State of New York, its agents, servants or employees. Obviously, therefore, once the negligence of the State was established the waivers lost any efficacy they might have had as a shield against claims of this nature. As stated in Van Dyke Prods. v. Eastman Kodak Co. (12 N Y 2d 301, 304): “ The law looks with disfavor upon attempts of a party to avoid liability for his own fault and, although it is permissible in many cases to contract one’s self out of liability for negligence, the courts insist that it must be absolutely clear that such was the understanding of the parties. In other words, it must be plainly and precisely provided that ‘ limitation of liability extends to negligence or other fault of the party attempting to shed his ordinary responsibility. ’ (Howard v. Handler Bros. & Winell, 279 App. Div. 72, 75-76, affd. 303 N. Y. 990 ”.
We find that no genuine and substantial issue exists in dispute between these parties. Claimants’ motion for summary judgment on the liability is granted. The defendant’s cross motion is denied in all respects.
The claims herein are set down for assessment of damages at the 1968 term of the Court of Claims at Watertown, New York, commencing on or about April 16, 1968.